# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

ERICK MARTINEZ,

                Petitioner,

       v.

HOREL,

              Respondent.

    )
    )
    )
    )
    )
    )
    )
    )
    )

No. CV 07-2051-PA (PLA)

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

      The Court submits this Report and Recommendation to the Honorable Percy Anderson, United States District Judge, pursuant to 28 U.S.C. Section 636 and General Order 194 of the United States District Court for the Central District of California.  For the reasons set forth below, the Magistrate Judge recommends that the Amended Petition for Writ of Habeas Corpus be dismissed with prejudice.

/

/

/

/

/

/

**I.**

## SUMMARY OF PROCEEDINGS

A Los Angeles County Superior Court jury convicted petitioner on May 25, 2004, of one count of attempted willful, deliberate, premeditated murder (Cal. Penal Code §§ 187(a), 189, 664), one count of assault with a firearm (Cal. Penal Code § 245(a)(2)), and one count of shooting at an occupied motor vehicle (Cal. Penal Code § 246). The jury found true firearm allegations within the meaning of California Penal Code §§ 12022.53(b) and (c). (Reporter's Transcript ("RT") 408, 411-15; Clerk's Transcript ("CT") 146-49, 152-54, 159-61). The trial court imposed a sentence of life with the possibility of parole, plus twenty years. (RT 419-23; CT 156-57, 159-61).

Petitioner appealed, and the California Court of Appeal affirmed the conviction in a reasoned opinion. (See Lodgment Nos. 1, 4). Petitioner subsequently filed a petition for review, which the California Supreme Court denied without comment on February 22, 2006. (See Lodgment Nos. 5, 7).

Petitioner filed a Petition in this Court on March 28, 2007. On April 18, 2007, petitioner filed an Amended Petition ("Am. Pet."), which is the operative pleading. Respondent filed an Answer and Return on September 5, 2007. On March 31, 2008, the Court received a letter from petitioner which is construed as his Reply.

This matter has been taken under submission, and is now ready for decision.

**II.**

## STATEMENT OF FACTS

**A.    Prosecution Evidence**

On July 15, 2003, at approximately 6:00 p.m., petitioner was with Corina Capehart and Parris Mendez at "Joe's Place," a bar located on Fernando Mission Boulevard and Woodley in the San Fernando Valley. Petitioner was drinking and smoking. Because the people sitting near him did not want him to smoke, petitioner moved to the table where Mendez was sitting. Theresa Hacker arrived at the bar and walked up to the table where petitioner and Mendez were sitting. Hacker and petitioner got into an argument. Mendez asked petitioner to "cool it." Petitioner told

1   Mendez, "shut the fuck up or you'll be wearing this pitcher." (RT 59-61, 104, 107-09, 165-66).

2   Mendez threw a pitcher of beer on petitioner. Petitioner made a derogatory comment to Hacker,

3   and she attempted to slap him. Petitioner blocked the slap. (RT 63-64, 81-82, 87, 151, 155-56,

4   167). Petitioner looked at Mendez and said, "you'll be sorry" and left the bar. (RT 65, 112).

5        Glenn Daniel (who is nicknamed "Bubba") saw that petitioner had left his sunglasses and

6   went out to the parking lot to return them. Daniel saw petitioner and placed the sunglasses on

7   the hood of petitioner's truck. Petitioner did not say anything. As Daniel turned to walk back into

8   the bar, he heard a crash. Daniel turned around and saw petitioner breaking the back window of

9   a pickup truck with a car club. Petitioner got into his truck and said, "I'll be back." (RT 90-93).

10  Daniel had no difficulty understanding petitioner's speech. (RT 96). According to Daniel,

11  petitioner "[s]eemed to be upright and walked fine." (RT 96).

12       Daniel came into the bar and told the owner what had occurred and asked the owner to call

13  the police. (RT 97). Several people went out to the parking lot, including Corina Capehart and

14  Parris Mendez. (RT 65-66, 112). Three windows in Mendez's pickup truck were broken. (RT

15  112, 115).

16       Petitioner then returned to the parking lot. (RT 71-73, 77, 117-19, 156). Mendez was

17  afraid, and got into his truck and left. Capehart returned to the bar. (RT 74-75, 77, 83, 119).

18       Petitioner then got into his truck and followed Mendez. Mendez was driving toward the

19  police station to report the incident. (RT 122-24). As Mendez approached a traffic light, petitioner

20  pulled up to the driver's side of Mendez's truck and started shouting. Petitioner was revving his

21  motor. Mendez turned his head forward and heard three or four gunshots. Mendez ducked down,

22  pulled his truck around another parked car, and proceeded through the red light. Mendez was

23  relieved that petitioner did not follow him, but noticed that his face was bleeding. (RT 125-27).

24  Mendez turned into a grocery store parking lot and asked the security guard to call 9-1-1. (RT

25  128).

26       Paramedics arrived and Mendez was transported to the hospital. (RT 128). Mendez had

27  bullet fragments and lacerations on his face. One bullet fragment was removed from his neck,

28  requiring three stitches. (RT 129-30).

There were four bullet holes in Mendez's truck, and two bullets were recovered from inside the truck. (RT 131-34, 137).

Investigating officer Orlando Martinez arrested petitioner. (RT 171-72). During a search of petitioner's truck, the following was recovered: a semiautomatic nine-millimeter handgun, a nine-millimeter magazine, and thirteen nine-millimeter rounds of ammunition. (RT 174-79, 187, 203). Additional boxes of ammunition were recovered from inside the residence where petitioner was arrested. (RT 182). Ballistics testing showed that one of the bullets recovered from inside Mendez's truck was fired from the handgun recovered from petitioner's truck. (RT 139-43, 214, 229).

**B.   Defense Evidence**

Petitioner testified in his own defense.

On July 15, 2003, petitioner arrived at Joe's Place at 9:00 a.m. He drank at least a pitcher of beer an hour until around 5:00 p.m. He also drank "a couple [of] shots" that he purchased at a nearby liquor store. By 5:00 p.m., he was "pretty" intoxicated. (RT 235-39).

Petitioner and Mendez used to drink together. Mendez was at the bar that evening when Hacker walked in. Petitioner was playing pool. Hacker sat in petitioner's seat, and he asked her to move. After Hacker ignored him, petitioner asked Hacker to move again, adding that he wanted to get to his pitcher of beer. (RT 240-43). Because Hacker did not move, petitioner told her to "Get the hell off the seat." Hacker got up and walked away, but turned and called petitioner an "asshole." Petitioner took a "swig" of his beer. Mendez told petitioner that he was mean and should have let Hacker remain in the seat. Petitioner stated: "Fuck that bitch." (RT 244). Hacker turned around and tried to slap petitioner, but petitioner caught her wrist. Hacker then tried to slap petitioner with her other hand, but petitioner grabbed that wrist as well. Petitioner let go of Hacker and she backed off. Mendez called petitioner an "idiot" and petitioner asked Mendez, "Parry, are you really going to take her side after you've known me a lot longer than you've known her just because you think you're going to get laid or something?" Petitioner turned around and felt something hit him in the side of the head. (RT 245). Petitioner felt pain and had beer in his eyes. He started screaming at Mendez. Mendez started slapping petitioner and tried to hit him with a

4

1  pitcher. The bar owner got between petitioner and Mendez and told them they needed to leave.

2  Petitioner left the bar, but returned to get his keys from the bartender and then left a second time.

3  (RT 246-47).

4       After he was outside, petitioner realized that he had been cut during the altercation.

5  Petitioner became "really angry" because he was bleeding. Petitioner took the club from his car

6  and broke the window of Mendez's car. Daniel had come out to the parking lot and placed

7  petitioner's sunglasses on his car. Petitioner took his sunglasses and drove off. (RT 247-48).

8       Petitioner did not go home, but went to the grocery store around the corner to treat his

9  injury. About ten minutes later, because he could not find parking at the grocery store, he

10  returned to Joe's Place to get Mendez's license plate number. (RT 250). Petitioner parked at a

11  distance, but was unable to see the plate number. When Mendez drove off, petitioner followed

12  him in an attempt to read the plate. After seeing the number, petitioner needed to go in the same

13  direction as Mendez was driving. As petitioner passed Mendez, Mendez swerved his truck into

14  petitioner's truck. Petitioner swerved into oncoming traffic, and Mendez drove away. (RT 251-52).

15       Petitioner continued driving in the same direction and passed Mendez. Petitioner heard

16  someone say, "I'll kill you." He looked over and saw Mendez close to his car waving a gun.

17  Petitioner had a gun registered in his name which he kept in his truck. Petitioner explained that

18  he worked the graveyard shift at his job, and his work is "very secluded" so he kept the gun in his

19  car for protection. The gun was in petitioner's backpack. (RT 252, 259-60). Petitioner picked up

20  his gun and fired four shots. (RT 261, 283). Petitioner continued driving and saw Mendez in his

21  rearview mirror. Mendez drove off and petitioner drove to a friend's house. (RT 262-63).

22

23                                    **III.**

24                        **PETITIONER'S CONTENTIONS**

25       1.    "The attempted murder charge should be dropped to self-defense or attempted

26  involuntary [manslaughter]" because there was insufficient evidence to show that petitioner had,

27  or was capable of forming, the specific intent to kill the victim. (Am. Pet., Attachment of Grounds,

28  Appellant's Opening Brief (attached to Petition) ("Op. Brief") at 12-19).

1      2.     The trial court improperly limited petitioner's testimony.  (Am. Pet., Attachment of

2  Grounds, Op. Brief at 20-27).

3      3.     Petitioner's rights to an impartial jury and to due process were violated.  (Am. Pet.,

4  Attachment of Grounds, Op. Brief at 28-35).

5      4.     Petitioner's trial counsel was ineffective.  (Am. Pet., Attachment of Grounds, Op.

6  Brief at 36-40).

7      5.     The trial court erroneously instructed the jury with CALJIC No. 5.55.  (Am. Pet.,

8  Attachment of Grounds, Op. Brief at 41-52).

9

10                        **IV.**

11                **STANDARD OF REVIEW**

12      The Petition was filed after the enactment of the Antiterrorism and Effective Death Penalty

13  Act of 1996 ("the AEDPA").  Pub. L. No. 104-132, 110 Stat. 1214 (1996).  Therefore, the Court

14  applies the AEDPA in its review of this action.  See Lindh v. Murphy, 521 U.S. 320, 336, 117 S.Ct.

15  2059, 138 L.Ed.2d 481 (1997).

16      Under the AEDPA, a federal court may not grant a writ of habeas corpus on behalf of a

17  person in state custody "with respect to any claim that was adjudicated on the merits in State court

18  proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to,

19  or involved an unreasonable application of, clearly established Federal law, as determined by the

20  Supreme Court of the United States; or (2) resulted in a decision that was based on an

21  unreasonable determination of the facts in light of the evidence presented in the State court

22  proceeding."  28 U.S.C. § 2254(d).  As explained by the Supreme Court, section 2254(d)(1)

23  "places a new constraint on the power of a federal habeas court to grant a state prisoner's

24  application for a writ of habeas corpus with respect to claims adjudicated on the merits in state

25  court."  Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389  (2000).  In

26  Williams, the Court held that:

27               Under the "contrary to" clause, a federal habeas court may grant the
                  writ if the state court arrives at a conclusion opposite to that reached

28               by this Court on a question of law or if the state court decides a case

1
2
3

differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

4   Williams, 529 U.S. at 412-13; see Weighall v. Middle, 215 F.3d 1058, 1061-62 (9th Cir. 2000)

5   (discussing Williams).  A federal court making the "unreasonable application" inquiry asks

6   "whether the state court's application of clearly established federal law was objectively

7   unreasonable." Williams, 529 U.S. at 409; Weighall, 215 F.3d at 1062. The Court explained that

8   "a federal habeas court may not issue the writ simply because that court concludes in its

9   independent judgment that the relevant state-court decision applied clearly established federal

10   law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams,

11   529 U.S. at 411; accord: Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144

12   (2003).  Section 2254(d)(1) imposes a "highly deferential standard for evaluating state-court

13   rulings," Lindh, 521 U.S. at 333 n. 7, and "demands that state court decisions be given the benefit

14   of the doubt." Woodford v. Visciotti, 537 U.S. 19, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002)

15   (per curiam).  A federal court may not "substitut[e] its own judgment for that of the state court, in

16   contravention of 28 U.S.C. § 2254(d)." Id.; Early v. Packer, 537 U.S. 3, 123 S.Ct. 362, 366, 154

17   L.Ed.2d 263 (2002) (per curiam) (holding that habeas relief is not proper where state court

18   decision was only "merely erroneous").

19        The only definitive source of clearly established federal law under the AEDPA is the

20   holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.

21   Williams, 529 U.S. at 412.  While circuit law may be "persuasive authority" for purposes of

22   determining whether a state court decision is an unreasonable application of Supreme Court law

23   (Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999)), only the Supreme Court's holdings

24   are binding on the state courts and only those holdings need be reasonably applied. Williams,

25   529 U.S. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003), cert. denied, 540 U.S. 968

26   (2003).  Furthermore, under 28 U.S.C. § 2254(e)(1), factual determinations by a state court "shall

27   be presumed to be correct" unless the petitioner rebuts the presumption "by clear and convincing

28   evidence."

1    The United States Supreme Court has held that "[w]here there has been one reasoned

2  state judgment rejecting a federal claim, later unexplained orders upholding the judgment or

3  rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803,

4  111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).  Here, the California Court of Appeal issued an

5  unpublished opinion rejecting all of the grounds for relief that are presented in the instant

6  Amended Petition. See People v. Martinez, 2005 WL 2995528 (Cal. App. 2 Dist. Nov. 9, 2005).

7  Without comment or citation to authority, the California Supreme Court denied review of the Court

8  of Appeal's decision.  In these circumstances, a district court "looks through" the unexplained

9  California Supreme Court decision to the last reasoned decision as the basis for the state court's

10  judgment. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing Ylst, 501 U.S.

11  at 803-04).  Accordingly,  this Court reviews the appellate court's opinion under the AEDPA

12  standards. See Ylst, 501 U.S. at 803.

13

14                                                   **V.**

15                                         **DISCUSSION**

16  **GROUND ONE:**     **"THE ATTEMPTED MURDER CHARGE SHOULD BE DROPPED TO**
                        **SELF-DEFENSE OR ATTEMPTED INVOLUNTARY [MANSLAUGHTER]"**
17                      **BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO SHOW THAT**
                        **PETITIONER HAD, OR WAS CAPABLE OF FORMING, THE SPECIFIC**
18                      **INTENT TO KILL THE VICTIM.**

19    Petitioner argues in Ground One that the attempted murder charge "should be dropped

20  to self-defense or attempted involuntary [manslaughter]" because "[i]f it cannot be proven a gun

21  was pointed at [him], the fact that all the witness[es] testified [he] had been drinking alcohol has

22  to be acknowledged." (Am. Pet., Attachment of Grounds).  Thus, according to petitioner, the

23  evidence was insufficient to prove attempted murder because he either acted in self-defense, or

24  because his intoxicated mental state rendered him incapable of forming the specific intent to kill

25  the victim. (Op. Brief at 12-19).

26       **A.     Relevant California Law**

27    Under California law, murder is the unlawful killing of a human being with malice

28  aforethought. (Cal. Penal Code § 187(a)).  A murder is of the first degree if it is perpetrated by

                                                      8

any kind of willful, deliberate, and premeditated killing with express malice aforethought. (Cal. Penal Code § 189). "'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." People v. Koontz, 27 Cal.4th 1041, 1080, 119 Cal.Rptr.2d 859 (2002). However, premeditation and deliberation can occur rapidly. "The test is not time, but reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." People v. Sanchez, 26 Cal.4th 834, 849, 111 Cal.Rptr.2d 129 (2001) (citation and internal quotations omitted). Further, to prove that a "killing was 'deliberate and premeditated,'" it need not be shown that the killer "maturely and meaningfully reflected upon the gravity of his or her act." Cal. Penal Code § 189.

An "unlawful killing of a human being without malice" is manslaughter. Cal. Penal Code § 192. "A defendant lacks malice and is guilty of voluntary manslaughter in limited, explicitly defined circumstances: either when the defendant acts in a 'sudden quarrel or heat of passion,' or when the defendant kills in 'unreasonable self-defense' -- the unreasonable but good faith belief in having to act in self-defense." People v. Lasko, 23 Cal.4th 101, 108, 96 Cal.Rptr.2d 441 (2000) (internal citations and some internal quotations omitted); see Cal. Penal Code § 192(a). To establish that a homicide occurred during the heat of passion, it must be proven that the killer was sufficiently provoked. Id. at 108. Specifically, "[t]he provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim, or be conduct reasonably believed by the defendant to have been engaged in by the victim." People v. Lee, 20 Cal.4th 47, 59, 82 Cal.Rptr.2d 625 (1999) (emphasis added) (internal citations omitted); People v. Manriquez, 37 Cal.4th 547, 583, 36 Cal.Rptr.3d 340 (2005). The test of adequate provocation is objective -- the provocation, whether physical or verbal, must be such that "it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." Manriquez, 37 Cal.4th at 584; Lee, 20 Cal.4th at 59.

To prove attempted murder, it must be established that a defendant took at least one direct but ineffective step toward killing a person and he intended to kill that person. (Cal. Penal Code §§ 664, 187(a); CALCRIM Nos. 600, 601).

In petitioner's case, the jury was instructed on the elements of attempted murder in the first degree (CALJIC Nos. 8.66, 8.67) and the elements of the lesser included offense of voluntary manslaughter, including the theories of "heat of passion" and self-defense (CALJIC Nos. 8.40, 8.42, 8.43, 8.44, 8.50, 5.17, 5.30, 5.50, 5.51, 5.52, 5.55). (See RT 320-31, 341-44 ; CT 102-04, 108-12, 127-33).   The jury was also instructed pursuant to CALJIC Nos. 4.21.1 and 4.22 to consider whether, if there was evidence of intoxication, petitioner had the specific intent necessary for the attempted murder charge. (See RT 339-41; CT 125).

## B.   The California Court of Appeal's Opinion

Petitioner unsuccessfully raised this claim on appeal.  In its determination that there was sufficient evidence of petitioner's intent to kill, the California Court of Appeal explained:

> Rarely will the intent of a wrongdoer be proven by direct evidence for "[o]ne who intentionally attempts to kill another does not often declare his state of mind either before, at, or after the moment he shoots." (People v. Lashley (1991) 1 Cal.App.4th 938, 945.) Rather, circumstantial evidence will usually determine this issue. The evidentiary sufficiency of a finding of premeditation and deliberation requires review of, among other circumstantial factors, (1) facts about the defendant's conduct showing prior planning, (2) facts about the defendant's relationship with the victim from which motive can be inferred, and (3) facts about the manner of killing from which the jury could infer that the defendant intentionally wanted to kill the victim as part of a preconceived plan to do so in a particular way for a specific reason. (People v. Anderson (1968) 70 Cal.2d 15, 26-27.) There is ample evidence in the record before us that [petitioner] had the motivation to kill Mendez.  [Petitioner] and Mendez had had an altercation, a short time before the shooting, in which Mendez had thrown a pitcher of beer on [petitioner], and according to [petitioner], hit him in the head and wrist, causing his hand to bleed.  When [petitioner] left the bar, he warned Mendez that, "You'll be sorry."  He broke three windows of Mendez's pickup truck as he was leaving the parking lot and stated, "I'll be back."
>
> There is also evidence that [petitioner] planned to murder Mendez. Planning can be inferred from evidence that the defendant obtained a weapon and used it upon the victim. (See, e.g., People v. Miller (1990) 50 Cal.3d 954, 993 [evidence that defendant kept a length of pipe in his car and used it as a weapon]; People v. Belmontes (1988) 45 Cal.3d 744, 792 [defendant armed himself with an iron bar, followed the victim to his front door and struck him as hard as he could]; People v. Haskett (1982) 30 Cal.3d 841, 850 [defendant obtained a weapon and parked outside the victim's home for several minutes before the attack]; People v. Francisco (1994) 22 Cal.App.4th 1180, 1192 [defendant obtained a gun to shoot someone and drove around looking for someone to shoot].) Premeditation and deliberation do not require much time (People v. Hughes (2002) 27

1  Cal.4th 287, 371), for "'[t]houghts may follow each other with great
   rapidity and cold, calculated judgment may be arrived at quickly.'"
2  (Ibid.)   There was evidence here permitting an inference that
   [petitioner] left Joe's Place to obtain a gun and then returned, as he
3  threatened he would, to kill Mendez.   Upon his return, [petitioner]
   followed Mendez, caught up with him, removed a gun from a bag next
4  to him on the front seat, chambered a round and shot four rounds into
   Mendez's truck, two bullets hitting the driver's cab area and bullet
5  fragments imbedding in Mendez's forehead and neck.

6        The manner of the attempted killing here is also probative of
   [petitioner's] intention. Firing four bullets at Mendez's truck at very
7  close range is a strong indicator of an intent to kill. (See, e.g., People
   v. Thomas (1992) 2 Cal.4th 489, 518; see also People v. Francisco,
8  supra, 22 Cal.App.4th at p. 1192 [five or six shots from five feet
   away].) He had no provocation by the victim to do so. (See People v.
9  Miller, supra, 50 Cal.3d at p. 993.) Certain acts of aggression, by their
   very nature, suggest an intent to kill. (See People v. Chinchilla (1997)
10 52 Cal.App.4th 683, 690; People v. Lashley, supra, 1 Cal.App.4th at
   p. 945 [shooting at point-blank range "undoubtedly creates a strong
11 inference that the killing was intentional"].)

12       There was also sufficient evidence to support the jury's implied
   finding that [petitioner] was not too intoxicated to have formed the
13 specific intent to kill Mendez.   Just because [petitioner] was drinking,
   does not compel the conclusion that he was intoxicated.   (People v.
14 Miller (1962) 57 Cal.2d 821, 830-831 ["The mere fact that a defendant
   may have been drinking prior to the commission of a crime does not
15 establish intoxication...."].)   Even if there is evidence of intoxication,
   a jury could still have reasonably concluded that [petitioner] retained
16 the capacity to intend to commit the crime. (See People v. Hernandez
   (1988) 47 Cal.3d 315, 346-347.)
17
         While [petitioner] testified that he was intoxicated, having drunk
18 10 pitchers of beer between 9:00 a.m. and 5:00 p.m., and an
   undisclosed number of "shots" obtained from the nearby liquor store,
19 there was evidence he exaggerated the amount he consumed. When
   asked how much he drank, [petitioner] initially testified that he drank
20 a pitcher every one to two hours.  If it was only every two hours, he
   only drank four or five pitchers during the course of the entire day.
21 One of the pitchers, nearly three-quarters full, was spilled on him by
   Mendez.  None of the other patrons who were asked saw him bring
22 shots back to the bar from the liquor store, as he claimed.

23       Moreover, [petitioner's] behavior suggested that whatever
   quantity he drank, it did not significantly impair him.  He was able to
24 play pool, hold the pool cue, walk with a normal gait, speak without
   slurring, remove the "Club" from his steering wheel and use it to break
25 Mendez's windows, drive his pickup truck, obtain his gun from a bag
   while driving and, with one hand, chamber a round and fire four shots
26 at Mendez's vehicle.  He also had a clear recollection of the events.

27       This evidence was sufficient to support the jury's guilty verdict.

28 Martinez, 2005 WL 2995528, at *4-5.

11

## C.   Analysis of Petitioner's Claim

In a federal habeas proceeding, a habeas petitioner challenging the sufficiency of the evidence may obtain relief only if "it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original); see also Schell v. Witek, 218 F.3d 1017, 1023 (9th Cir. 2000).  If the record supports conflicting inferences, the Court "must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326; see also Wright v. West, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (plurality opinion); Schell, 218 F.3d at 1023. The reviewing habeas court must respect the exclusive province of the fact finder to resolve evidentiary conflicts and draw reasonable inferences from proven facts. See United States v. Goode, 814 F.2d 1353, 1355 (9th Cir. 1987). Moreover, this Court applies an additional layer of deference under AEDPA on federal habeas review of an insufficient evidence claim: habeas relief is not warranted unless "the state court's application of the Jackson standard [was] 'objectively unreasonable.'" Juan H. v. Allen, 408 F.3d 1262, 1274, 1275 n.13 (9th Cir. 2005) (as amended), cert. denied, 546 U.S. 1137 (2006).

Here, after viewing the evidence presented at trial in the light most favorable to the prosecution, and presuming that the trier of fact resolved all conflicting inferences from the evidence against petitioner, the Court finds that a rational trier of fact could reasonably have found beyond a reasonable doubt that petitioner had the requisite intent to commit murder. See Jackson, 443 U.S. at 325-26. The record shows that, shortly before the shooting, petitioner and Mendez had an argument, in which Mendez threw a pitcher of beer at petitioner. When petitioner left the bar he warned Mendez, "You'll be sorry." (RT 65, 112). After petitioner broke three windows in Mendez's truck, he warned, "I'll be back" before driving away. (RT 90-93). Petitioner then drove back to Joe's Place and proceeded to follow Mendez as he left in his truck. While at

close range, petitioner removed a gun from his bag and fired four shots at Mendez's truck, with two bullets hitting the driver's area and bullet fragments hitting Mendez's forehead and neck. From this evidence, a rational juror could reasonably conclude that petitioner had the motivation to kill Mendez and planned to do so as it could be reasonably inferred from the sequence of events that, after the initial altercation with Mendez, petitioner left the bar to obtain his gun and then returned to confront Mendez. Even if the jury believed that petitioner had the gun in his truck throughout the incident, petitioner nevertheless drove away from the bar and then drove back to confront Mendez -- actions from which it could be inferred that petitioner had time to deliberate and plan. Moreover, as the California Court of Appeal observed, the fact that petitioner fired four bullets at close range at Mendez's truck further indicated an intent to kill. The jury was instructed on the issue of intoxication (see RT 339-41; CT 125), but evidently found that petitioner was not so intoxicated that he did not have the requisite intent to kill. To the extent the jury made credibility determinations in reaching this conclusion, those determinations will not be disturbed in this habeas review. Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004) (a jury's credibility determinations are entitled to "near-total deference under Jackson").[1]

In any event, when viewing the evidence in the light most favorable to the prosecution, petitioner's actions did not indicate that he was significantly impaired. As the state appellate court found, petitioner was able to play pool, walk normally, speak without slurring, remove the car club from his steering wheel and then use it to break Mendez's windows, drive his truck (apparently without difficulty), remove his gun from a bag while driving, and then fire four shots at Mendez's truck. (RT 86, 148-49, 154, 271, 285-86). Petitioner also testified regarding the events of the evening and did not indicate that he had any difficulty recalling what had occurred. (RT 235-62).

---

[1] To the extent petitioner argues that the evidence was insufficient to support the attempted murder charge because he acted in self-defense after Mendez pointed a gun at him, this claim fails. The jury was thoroughly instructed on the theory of self-defense and imperfect self-defense. (See RT 341-44; CT 127-33). In reaching its verdict the jury apparently made a credibility determination in the prosecution's favor and rejected the self-defense theory. Again, the jury's credibility determinations will not be disturbed here. Bruce, 376 F.3d at 957. For the reasons explained above, there was ample evidence showing that petitioner had the requisite intent to kill.

1   Moreover, petitioner testified that after he initially drove away from the bar to treat his injury, he

2   then drove back to obtain Mendez's license plate number.  He also testified that he shot Mendez

3   because Mendez waved a gun at him, and not because he was intoxicated.  On this record, a

4   rational juror could reasonably conclude that, if petitioner were intoxicated, he was not impaired

5   in such a way that he was incapable of having the specific intent necessary for the attempted

6   murder charge.

7        For these reasons, the Court concludes that the California Court of Appeal's reasoned

8   denial of petitioner's insufficiency of the evidence claim was not an objectively unreasonable

9   application of the Jackson standard.  Habeas relief is not warranted for Ground One.  28 U.S.C.

10  § 2254(d); Williams, 529 U.S. at 411-12.

11

12  **GROUND TWO:     THE TRIAL COURT IMPROPERLY LIMITED PETITIONER'S TESTIMONY**.

13        In Ground Two, petitioner asserts that the trial court improperly limited his testimony

14  concerning why he was carrying a firearm at the time of the incident and thus violated his

15  constitutional rights to due process and to present a defense. (Am. Pet., Attachment of Grounds,

16  Op. Brief at 20-27).

17  **A.     Summary of Relevant Facts**

18        In its opinion rejecting petitioner's direct appeal, the California Court of Appeal provided

19  the following factual summary relevant to this claim:

20         Before trial began, the prosecutor moved to exclude evidence
           that [petitioner] was an animal control regulation officer and pictures
21         of [petitioner] wearing his badge, because "animals are just a loaded
           kind of thing." The trial court deferred considering this issue until it
22         arose during trial.

23         During [petitioner's] testimony, at a sidebar conference,
           defense counsel made an offer of proof that [petitioner] was going to
24         testify that he was an animal control officer, working a dangerous job
           with dangerous animals, in remote locations, late at night, and carried
25         a gun for self-protection. He argued that this evidence was relevant
           to explain why he had a gun and to negate the prosecution's evidence
26         of premeditation and specific intent.

27         The prosecutor conceded that [petitioner] could testify that he
           carried a gun because he worked the graveyard shift, but did not
28         "think the jury needs to know he's . . . [an] animal control officer."

1
2
3
     Upon inquiry by the trial court, [petitioner's] counsel stated that he did not believe [petitioner] could testify that his employer allowed him to carry a weapon when he worked graveyard. He just carries it for "his own kind of thing."

4
5
6
7
     Consequently, the trial court ruled that the nature of [petitioner's] job and a fuller explanation of why he carried a firearm at work were not relevant, as there was no evidence he was required to carry a gun for his job. [Petitioner] was permitted to, and did, testify that he worked from midnight until 8:00 a.m., that when he shot Mendez his gun was in a backpack in his truck because he worked in a secluded area, his "job had been recently burglarized," and he kept the gun to protect himself.

8   <u>Martinez</u>, 2005 WL 2995528, at *6.

9   **B.**   **The California Court of Appeal's Decision**

10   On direct appeal, the California Court of Appeal concluded:

11
12
13
14
15
16
     We review a trial court's admission of evidence as against a relevance objection under the deferential abuse of discretion standard. (<u>People v. Brown</u> (2003) 31 Cal.4th 518, 577.) "Except as otherwise provided by statute, all relevant evidence is admissible." ([Cal.] Evid. Code, § 351.) Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." ([Cal.] Evid. Code, § 210.) We cannot say that the trial court abused its discretion in excluding the additional evidence that [petitioner] worked for the animal control department.

17
18
19
20
21
     There was evidence from which an inference could be drawn that after his altercation with Mendez in the bar, [petitioner] went home or elsewhere to retrieve a gun. This, in turn, permitted an inference that [petitioner] planned and premeditated the killing of Mendez. Evidence that [petitioner] carried a gun with him was relevant to rebut this inference and to suggest that the shooting was a spontaneous, unplanned occurrence. But [petitioner] was permitted to introduce this evidence. The details of his employment were irrelevant, particularly because he was not required to carry the gun as part of his job.

22
23
24
25
26
27
28
     Even if the trial court erred in refusing to allow the additional evidence [petitioner] sought to introduce, the error was harmless in that it is not reasonably probable that had it been admitted [petitioner] would have obtained a more favorable result. (<u>People v. Watson</u> (1956) 46 Cal.2d 818, 836.) The evidence that [petitioner] intended to kill Mendez was strong. He threatened that Mendez would be sorry for having thrown beer on him, left the bar and returned, followed Mendez in his car, loaded his gun and fired at him through the car window at close range. Further, [petitioner] was permitted to testify that he carried his gun with him in his truck because he worked the night shift, the core of the evidence he sought to introduce to rebut the challenged inference of premeditation.

Martinez, 2005 WL 2995528, at *7-8.

### C.    Analysis of Petitioner's Claim

"[T]he Constitution guarantees criminal defendants a 'meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (citation omitted).  "[T]he erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense." DePetris v. Kuykendall, 239 F.3d 1057, 1062 (9th Cir. 2001) (citing Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)).  The Ninth Circuit has held that the following factors must be weighed to determine whether the exclusion of evidence reaches constitutional proportions: "(1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense." Chia v. Cambra, 360 F.3d 997, 1004 (9th Cir. 2004).

After balancing these five factors, the Court concludes that the exclusion of evidence concerning petitioner's job title did not violate petitioner's constitutional rights.  Evidence concerning whether the gun was in petitioner's possession at the time of the altercation with Mendez was relevant to the determination of whether the shooting was spontaneous and unplanned as petitioner argued. At trial, petitioner testified that his work shift lasted from midnight until 8:00 a.m., that when he shot Mendez his gun was in a backpack in his truck because he worked in a secluded area, that his job had been recently burglarized, and that he carried the gun to protect himself.  He was only prohibited from testifying regarding the nature of his job as an animal control officer. (RT 252, 255-60). The relevance of the excluded evidence on the issue of whether petitioner planned and premeditated the shooting, however, was minimal -- especially considering that petitioner was allowed to state the primary reason he carried the gun, i.e., for self-protection given the dangers of his job.  In light of its meager relevance, it cannot be said that the information concerning petitioner's employment details was a major part of petitioner's defense. Under these circumstances, the Court is persuaded that even assuming the evidence was reliable and not cumulative, and that it was capable of being evaluated by the jury, those

1  factors are outweighed by the lack of probative value coupled with the minuscule role the

2  excluded evidence played in petitioner's case. Accordingly, the exclusion was not unconstitutional

3  and, in turn, petitioner's right to present a defense was not violated.

4       In any event, even if the exclusion were in error, habeas relief can be granted only if the

5  erroneous exclusion had a "substantial and injurious effect" on the verdict. Brecht v. Abrahamson,

6  507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). In light of the prosecution's evidence

7  from which it can be inferred that petitioner planned the shooting, see supra, petitioner has not

8  demonstrated Brecht error. In short, there is no reasonable probability that, had petitioner testified

9  in greater detail regarding the nature of his job, the jury would have decided the case differently.

10       For these reasons, the state court's denial of this claim was not an unreasonable

11  application of, or contrary to, clearly established United States Supreme Court precedent. Habeas

12  relief is denied for Ground Two. 28 U.S.C. § 2254(d); Williams, 529 U.S. at 411-12.

13

14  **GROUND THREE: PETITIONER'S RIGHTS TO AN IMPARTIAL JURY AND DUE PROCESS**

                                 **WERE VIOLATED.**

15

16       Petitioner asserts in Ground Three that the trial court, by failing to question the jury

17  foreperson after learning that the foreperson knew petitioner, erred in violation of petitioner's rights

18  to due process and to an impartial jury. (Am. Pet., Attachment of Grounds, Op. Brief at 28-35).

19       **A.    Summary of Relevant Facts**

20       On May 17, 2004, at the beginning of voir dire, after the prospective jurors swore to

21  accurately and truthfully answer the questions that were going to be asked of them under penalty

22  of perjury, the trial court introduced petitioner and both counsel to the prospective jurors and

23  asked: "Is there anybody out in the audience that recognizes any of the three folks I just

24  introduced to you?" None of the jurors indicated that they recognized them. (RT 14-15, 18-20).

25       On May 25, 2004, the jury rendered its verdict, finding petitioner guilty as charged. At the

26  sentencing hearing nearly a month later, petitioner's counsel advised the trial court that petitioner

27  knew the jury foreman. He stated: "Just put one brief matter on the record we discussed in

28  chambers, and that is my client informed me after the verdict in this case that he knew one of the

1  jurors that actually was a juror on this case that was the foreperson of the jury. I discussed that

2  with him, and at this point I don't have anywhere to go as far as following up on that statement by

3  my client. My client told me today that he would like to proceed with the sentencing regardless

4  of that information he provided me with, so that's what I intend to do." (RT 419-20). Upon hearing

5  this, the trial court did not summon the juror for questioning, but only asked defense counsel when

6  it was that petitioner revealed this information. Defense counsel responded that it was after the

7  verdict in the case and after the jury had been polled. (RT 419-20).

8      **B.     The California Court of Appeal's Decision**

9          On direct appeal, the California Court of Appeal found that although petitioner had waived

10  the claim, it still failed on the merits, stating:

11              Even if the claim had not been waived, we would nonetheless
           reject it on the merits. A juror cannot decide a case based on
12          personal knowledge of facts related to the specific matter. (See
           People v. Cumpian (1991) 1 Cal.App.4th 307, 313 [juror resort to
13          extrinsic evidence is basis for a misconduct finding].) A juror also
           commits misconduct by violating his or her oath or by failing to follow
14          the trial court's instructions or admonitions. (In re Hamilton, supra, 20
           Cal.4th at p. 305.) If there was evidence that the jury foreperson
15          knew personal facts about [petitioner] that bore on this case or lied
           when the foreperson testified that he did not know [petitioner], a case
16          of misconduct might have been established. The question is whether
           sufficient facts of such misconduct existed to warrant the trial court
17          making further inquiry.

18              A trial judge "must conduct a sufficient inquiry to determine
           facts alleged as juror misconduct 'whenever the court is put on notice
19          that good cause to discharge a juror may exist.'" (People v. Davis
           (1995) 10 Cal.4th 463, 547; People v. Bradford (1997) 15 Cal.4th
20          1229, 1348; People v. Williams, supra, 16 Cal.4th at p. 230.) In order
           to justify investigation, there must be more than mere speculation of
21          juror misconduct. The juror's inability to perform must appear as a
           ""demonstrable reality."" (Id. at p. 231.) Both the decision to
22          investigate and the decision as to whether there was misconduct
           justifying discharge rest in the trial court's sound discretion. (People
23          v. Bradford, supra, at p. 1347.) In order to believe a juror will be
           unable to fulfill his or her function as a juror, the misconduct must be
24          serious and willful. (People v. Bowers (2001) 87 Cal.App.4th 722,
           729.)

25

26              The trial court did not abuse its discretion in failing to conduct
           further investigation into juror misconduct here. The issue was raised
27          a month after the verdict was entered and the jury was discharged.
           [Petitioner's] counsel reported to the trial court that [petitioner] knew
28          the jury foreperson. He did not say that the juror knew [petitioner]. He
           also did not say how [petitioner] knew the juror, which might have

18

provided insight into whether the juror also knew [petitioner], or if the juror remembered [petitioner], if he ever knew him. It would have been rampant speculation, at best, to suspect that there was juror misconduct based on the delayed, meager information provided by [petitioner].

Martinez, 2005 WL 2995528, at *9 (emphasis in original).

## C.    Analysis of Petitioner's Claim

A criminal defendant has a Sixth Amendment right to a verdict by impartial jurors. Turner v. Louisiana, 379 U.S. 466, 471-72, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); Green v. White, 232 F.3d 671, 676 (9th Cir. 2000); Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998). "If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel." United States v. Hendrix, 549 F.2d 1225, 1227 (9th Cir. 1977); Dyer, 151 F.3d at 973. Moreover, a defendant is entitled to a jury that "reaches a verdict on the basis of evidence produced at trial, exclusive of 'extrinsic evidence.'" Grotemeyer v. Hickman, 393 F.3d 871, 877 (9th Cir. 2004). In other words, "[j]urors have a duty to consider only the evidence which is presented to them in open court." Bayramoglu v. Estelle, 806 F.2d 880, 887 (9th Cir. 1986); see also United States v. Navarro-Garcia, 926 F.2d 818, 821-22 (9th Cir. 1991) (noting that "a juror's personal experiences may constitute extrinsic evidence" in some instances).

"Clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror bias is raised." Tracey v. Palmateer, 341 F.3d 1037, 1045 (9th Cir. 2003); see also United States v. Hanley, 190 F.3d 1017, 1031 (9th Cir. 1999) (evidentiary hearing not required every time a defendant alleges juror misconduct or bias). Generally, a hearing is justified only when the evidence showing juror misconduct or bias is sufficient on its face to require setting aside the verdict. See Hard v. Burlington Northern R.R. Co., 870 F.2d 1454, 1461 (9th Cir. 1989); see also United States v. Langford, 802 F.2d 1176, 1180 (9th Cir. 1986) ("While we recognize that where a trial court learns of a possible incident of jury misconduct, it is preferable to hold an evidentiary hearing . . . not every allegation [of misconduct] requires a full-dress hearing"). Moreover, when the trial court is aware of the exact scope and nature of the alleged misconduct, a hearing is not necessarily

19

1  required to explore the matter further. See United States v. Halbert, 712 F.2d 388, 389 (9th Cir.
2  1983).

3       In this case, the Court finds that petitioner's assertion of jury bias or misconduct is based
4  on speculation, and under these circumstances, it was not error for the trial court to not conduct
5  a hearing on the matter. Although petitioner claims that he knew the jury foreperson, there was
6  no indication that the juror foreperson knew or even recognized petitioner. As the record shows,
7  at voire dire, after the jury had been sworn to tell the truth, the trial court asked the jury panel if
8  anyone recognized petitioner, and no juror responded affirmatively. Moreover, petitioner failed
9  to bring this issue to his counsel's or the trial court's attention until after the verdict was reached.
10 It appears that if petitioner were concerned about his connection with the foreperson and possible
11 juror bias, he would have raised the issue with his counsel at some point during voir dire, during
12 the trial, or at some point prior to deliberations. As the California Court of Appeal determined, it
13 "would have been rampant speculation, at best, to suspect that there was juror misconduct based
14 on the delayed, meager information provided." Martinez, 2005 WL 2995528, at *9. In any event,
15 the record gives no indication that the foreperson was unable to decide the case solely on the
16 evidence before the jury. Nor is there any indication that other jurors were biased against
17 petitioner such that deliberations were not impartial. Moreover, the Court notes that the jury was
18 instructed to base its verdict on "the evidence received in the trial and not from any other source."
19 (RT 307; CT 80). Absent any evidence to the contrary, the Court presumes that each juror
20 followed this instruction and, in reaching the verdicts, did not consider any extraneous matters that
21 would have affected his or her impartiality. See Weeks v. Angelone, 528 U.S. 225, 234, 120 S.Ct.
22 727, 145 L.Ed.2d 727 (2000).

23      For these reasons, the Court concludes that petitioner failed to demonstrate that his right
24 to an impartial jury was violated. The state court's denial of this claim was therefore not an
25 unreasonable application of, or contrary to, clearly established United States Supreme Court
26 precedent. Habeas relief is denied for Ground Three. 28 U.S.C. § 2254(d); Williams, 529 U.S.
27 at 411-12.

28 /

**GROUND FOUR:   PETITIONER'S TRIAL COUNSEL WAS INEFFECTIVE**.

In Ground Four, petitioner contends that his trial counsel was ineffective for failing to inform the trial court in a timely manner that the foreperson knew petitioner, and for failing to take any other action to protect petitioner's right to a fair trial. (Am. Pet., Attachment of Grounds, Op. Brief. at 36-40).

### A.   The California Court of Appeal's Decision

In its opinion denying petitioner's appeal, the California Court of Appeal rejected this claim as follows:

> The record before us is insufficient to allow us to conclude that there is a reasonable probability that but for counsel's delay in notifying the trial court that [petitioner] knew a juror, or counsel's failure to request further investigation of that issue, a different result would have ensued. . . . [T]here is no evidence of how or when [petitioner] knew the juror, or if the juror knew [petitioner]. The record also fails to indicate precisely when [petitioner] told his attorney that he knew the jury foreperson. While it suggests that it was after the jury verdict and the jury was polled, it is unclear if it was before or after the jury was discharged. [Footnote.] The record is also barren of any indication why [petitioner] delayed communicating the information to his attorney until after the jury returned.
>
> [Petitioner] lost this claim by virtue of his own indolence in presenting it to his counsel and his instruction to his attorney not to delay sentencing to press the issue, not by any acts or omissions by his attorney. (See People v. Kirkpatrick (1994) 7 Cal.4th 988, 1013 ["'a defendant who insists that mitigating evidence not be presented at the penalty phase is estopped from later claiming ineffective assistance based on counsel's acquiescence in his [or her] wishes'"].)

Martinez, 2005 WL 2995528, at *10.

### B.   Petitioner's Claim of Ineffective Assistance

In federal habeas proceedings, the two-step analysis outlined by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), governs ineffective assistance claims.  Under Strickland, petitioner first must prove that his attorney's representation fell below an objective standard of reasonableness by identifying the acts or omissions that rendered the representation objectively unreasonable.  Id. at 687-88, 690.  An attorney's performance is deemed deficient if it is objectively unreasonable under prevailing professional norms.  Strickland, 466 U.S. at 687-88; Hughes v. Borg, 898 F.2d 695, 702 (9th Cir.

1  1990). Review of counsel's performance is highly deferential, and the petitioner must overcome

2  the strong presumption that counsel's conduct fell within the wide range of reasonable

3  representation. Strickland, 466 U.S. at 689. The reviewing court need not determine the actual

4  reason for an attorney's actions, as long as the act falls within the range of reasonable

5  representation. See Morris v. California, 966 F.2d 448, 456-57 (9th Cir. 1991). In reviewing a

6  challenge to the effectiveness of trial counsel, the court must make "every effort . . . to eliminate

7  the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

8  conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S.

9  at 689.

10      In the second step, petitioner must show that he was prejudiced by counsel's deficient

11  performance by demonstrating a reasonable probability that, but for his counsel's errors, the result

12  of the proceeding would have been different. Strickland, 466 U.S. at 692, 694. "A reasonable

13  probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

14  Petitioner bears the burden of satisfying both prongs of Strickland. Id. at 687; United States v.

15  Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).

16      Here, the Court concludes that petitioner's ineffective assistance claim premised on trial

17  counsel's alleged failure to notify the trial court in a timely matter regarding petitioner's knowledge

18  of the jury foreperson lacks merit because petitioner has shown no prejudice within the meaning

19  of Strickland. See Strickland, 466 U.S. at 694. Again, although petitioner claims that he knew the

20  foreperson, the record shows that, based on the voir dire questions, the jury foreperson did not

21  know or even recognize petitioner. Based on this scant evidence of bias or misconduct, and given

22  the fact that petitioner waited until after the verdict was decided to raise the issue,[2] there is no

23  reasonable likelihood that had a hearing been held by the trial court to inquire further into

24

25  [2]    After petitioner informed defense counsel subsequent to the verdict being reached

26  that he knew the foreperson, defense counsel notified the trial court of this issue at the next court
    proceeding. Moreover, although the trial court was notified, defense counsel stated that petitioner

27  wanted to proceed with sentencing "regardless of that information [regarding the foreperson]."
    (RT 419-20). The record gives no indication that petitioner objected to proceeding with the

28  sentencing, or otherwise indicated that he wanted to delay sentencing, on account of his alleged
    relationship with the jury foreperson.

1 petitioner's alleged relationship with the jury foreperson, that a new trial would have been ordered.

2 Thus, the Court finds that petitioner's claim of prejudice under <u>Strickland</u> is too speculative to

3 warrant relief.  <u>See</u> <u>Grisby v. Blodgett</u>, 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation . . . is not

4 enough to establish prejudice.").

5       For these reasons, the state court's denial of this claim was not an unreasonable

6 application of, or contrary to, clearly established United States Supreme Court precedent.  Habeas

7 relief is denied for Ground Four. 28 U.S.C. § 2254(d); <u>Williams</u>, 529 U.S. at 411-12.

8

9 **GROUND FIVE:**     **THE TRIAL COURT ERRONEOUSLY INSTRUCTED THE JURY WITH**

10                                    **CALJIC NO. 5.55.**

11       In Ground Five, petitioner asserts that the trial court erred in giving CALJIC No. 5.55, which

12 provides:  "The right of self-defense is not available to a person who seeks a quarrel with the

13 intent to create a real or apparent necessity to exercise self-defense." (RT 343-44; CT 132).

14       According to petitioner, "[he] did not initiate a quarrel within the meaning of that instruction"

15 and "[t]he instruction erroneously deprived [him] of the right of self-defense because he was not

16 an initial aggressor who used deadly force and was met with deadly force by his pursuers." (Op.

17 Brief at 41).  He argues that the instruction is based on the principle that one "cannot commence

18 a conflict with someone and then use a contrived plea of self-defense in order to retroactively

19 justify what was essentially an unprovoked criminal assault." (Op. Brief at 42).  Petitioner asserts

20 that the principle has no application to his case because "neither [his] verbal altercation with

21 Mendez, nor his breaking Mendez's truck windows outside Mendez's presence constituted an act

22 that warranted Mendez to act in self defense." (<u>Id.</u>).  According to petitioner, CALJIC No. 5.55 is

23 therefore an incorrect statement of the law as applied to this case.  (<u>Id.</u>).

24     **A.**     **The California Court of Appeal's Opinion**

25       On direct appeal, the California Court of Appeal rejected petitioner's claim concerning the

26 instructions on the limitations of self-defense as follows:

27                         "'It is settled that in criminal cases, even in the absence of a
                       request, the trial court must instruct on the general principles of law
28                        relevant to the issues raised by the evidence.  [Citations.]  The

general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case. [Citations.]"'" (People v. Edwards (1985) 39 Cal.3d 107, 117.) CALJIC No. 5.55 articulates the general principle of law that a defendant cannot commence a dispute with a person and use that person's response as a contrived justification for a plea of self-defense. (See People v. Hinshaw (1924) 194 Cal. 1, 26.)  It was therefore properly given, if there was evidence to support it.

The defense of self-defense is not lost if the person who is the initial aggressor uses force that does not justify a deadly response. That person may use deadly force in response to the unjustified deadly response by the other person. (See People v. Hardin (2000) 85 Cal.App.4th 625, 630-631.) A minor wrongdoer met with a deadly and unjustified counter attack does not lose his right to self-defense. (People v. Hecker (1895) 109 Cal. 451, 464.)  However, if the initial wrongdoer engaged in conduct that would make the victim reasonably believe that his or her life is in imminent peril legally justifying the victim's use of deadly force, although the initial attack did not, then the right of self-defense is lost. (See People v. Hardin, supra, at p. 630 ["'It is well established that the ordinary self-defense doctrine -- applicable when a defendant reasonably believes that his safety is endangered -- may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified'"].)

There was evidence here permitting an inference that Mendez reasonably believed his life was in imminent peril when he purportedly waved a gun at [petitioner]. [Petitioner] left the bar threatening that Mendez would "be sorry," and that he would be back. He then used the "Club" to break three windows of Mendez's truck, with little concern to the criminal nature of his conduct or that there was a witness to it. He left Joe's Place, returned and followed Mendez's truck closely, racing his engine.  These circumstances justified Mendez's fear of a deadly attack and his threat to make a deadly response.

Even assuming for the sake of argument that the trial court erred in giving this instruction, we would find any error to be harmless, as there was no reasonable probability (or even possibility) that [petitioner] would have received a more favorable verdict if CALJIC No. 5.55 had not been given. (People v. Watson, supra, 46 Cal.2d at p. 836.) Assuming this instruction was unwarranted by the evidence, giving it is usually held harmless error. (See People v. Garnier (1950) 95 Cal.App.2d 489, 496-497; see also People v. Olguin (1994) 31 Cal.App.4th 1355, 1381; People v. Crandell (1988) 46 Cal.3d 833, 872.) Here, the evidence against [petitioner] was strong. He admitted shooting at Mendez's vehicle, and gave a story that was incredulous in several respects.  In addition to CALJIC Nos. 5.50 and 5.55, the trial court instructed the jury with a series of CALJIC self-defense instructions: 5.17 (actual but unreasonable belief in necessity to defend); 5.30 (self-defense against assault), 5.51 (self-defense-actual danger not necessary) and 5.52 (self-defense-when danger ceases).

> It has been considered harmless to give CALJIC No. 5.55, even when unsupported by the evidence, where, as here, a series of self-defense instructions are given, some applicable and some not, depending upon the jury's factual findings, and the jury has also been given CALJIC No. 17.31, instructing the jury, "Disregard any instruction which applies to facts determined by you not to exist. Do not conclude that because an instruction has been given I am expressing an opinion as to the facts." (People v. Olguin, supra, at p. 1381.) We cannot assume, as [petitioner] suggests, that the jury disregarded that instruction and chose instead to follow an irrelevant instruction. (See People v. Guiton (1993) 4 Cal.4th 1116, 1127; People v. Crandell, supra, at p. 872.)

Martinez, 2005 WL 2995528, at *11-12.

## B.    Federal Law Regarding Instructional Error

To obtain habeas relief, petitioner must show that the alleged instructional error so infected the entire trial that the resulting conviction violated due process. Estelle v. McGuire, 502 U.S. 62, 71-72, 112 S.Ct. 475, 116 L.Ed.2d 385; Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977).   "[I]t must be established not merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). The reviewing court must not view the instruction in isolation, but should consider it in the context of the trial record and the instructions as a whole. Estelle, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. United States v. Frady, 456 U.S. 152, 169, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

Even if there is some ambiguity in an instruction, that alone does not amount to a due process violation. See Waddington v. Sarausad, __ U.S. __, 129 S.Ct. 823, 831, 172 L.Ed.2d 532 (2009). Rather, in the event of an ambiguity, the habeas court must inquire whether there was a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the United States Constitution. Estelle, 502 U.S. at 72 & n. 4; Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

Here, petitioner's instructional error argument lacks merit as he has failed to establish any due process violation. As the California Court of Appeal concluded, even if the jury believed

petitioner's allegation that Mendez waved a gun at him while they were driving, it could be inferred from the evidence involving the altercation between petitioner and Mendez that Mendez at that time reasonably believed that his life was in danger. Specifically, the record shows that petitioner verbally threatened Mendez while inside the bar, told Mendez "you'll be sorry," broke windows in Mendez's truck, and then followed Mendez as Mendez drove away from the bar. Based on this evidence, it could be determined that Mendez was justified in fearing a deadly attack and in making a threat of deadly force in response. Thus, because there was evidence to support the giving of CALJIC No. 5.55, petitioner has not demonstrated any due process violation.

In any event, even assuming the trial court erred in giving CALJIC No. 5.55, the result was harmless because the record does not show that it had a substantial and injurious effect or influence on the verdict. Brecht, 507 U.S. at 623. First, as discussed supra, the evidence showing that petitioner committed attempted murder was substantial. There is no reasonable likelihood that, had the instruction been omitted, the verdict would have been any different. Moreover, to the extent CALJIC No. 5.55 was not applicable in the case, the Court notes that the jury was also instructed: "Whether some instructions apply will depend upon what you find to be the facts. Disregard any instruction which applies to facts determined by you not to exist. Do not conclude that because an instruction has been given [the court] is expressing an opinion as to the facts." (RT 344). The Court presumes that the jury understood and followed this instruction, and in turn, disregarded any instructions that were factually inapplicable. See Weeks, 528 U.S. at 234.

For these reasons, the California Court of Appeal's determination rejecting petitioner's claim of instructional error was not contrary to, nor did it involve an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d); Williams, 529 U.S. at 411-12. Habeas relief is denied for Ground Five.

/

/

/

26

# VI.

## RECOMMENDATION

It is recommended that the District Court issue an Order: (1) adopting this Report and Recommendation; and (2) directing that judgment be entered denying the Amended Petition and dismissing this action with prejudice.


**This Report and Recommendation is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**


DATED: April 20, 2010

PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Reports and Recommendations are not appealable to the Court of Appeals, but are subject to the right of any party to file Objections as provided in the Local Rules Governing Duties of Magistrate Judges, and review by the District Judge whose initials appear in the docket number. No Notice of Appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the Judgment of the District Court.